[No. 46808-7. En Banc. January 15, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. GEORGE E. FRANCO, *Appellant.*

*Shelley Stark* of *Seattle–King County Public Defender*

*Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Douglas B. Whalley, Senior Deputy,* and *James M. Roe, Deputy,* for respondent.

*Stephen W. Hayne, Peter Moote, Joseph L. Koplin,* and *Jack Youngberg,* amici curiae for appellant.

DIMMICK, J.—George Franco appeals from a superior court jury verdict finding him guilty of driving while under the influence of intoxicating liquor (DWI). His appeal raises questions concerning the interpretation of that recently enacted law and its constitutional effect on the implied consent law. We hold the DWI statute sets out alternative methods of committing one crime, and find no constitutional violation of Franco's rights by virtue of the provisions of the implied consent law.

At 1:56 a.m., September 12, 1979, appellant Franco was driving a red Toyota on the University of Washington campus. While southbound on Stevens Way, he executed a tight left–hand turn to go northbound on Whitman Court. During the process of the turn the tires were squealing, which caused a University of Washington police officer to take notice. The officer had a "good idea" that the Toyota was exceeding the posted speed limit of 20 miles per hour, he had also observed pedestrians step out of the Toyota's way, so he accelerated to get in behind the car and followed it approximately one–half block until the car pulled over to discharge a passenger. The officer, on approaching the vehicle, informed the driver that he had been speeding, asked for his operator's license and at the time noticed a slight odor of alcohol about his person. He requested that Franco step from the car and perform the finger–to–nose test. The officer observed that Franco was swaying and that he performed the finger–to–nose test poorly. He arrested the appellant for driving while under the influence of intoxicating liquor and transported him to the police station. After being advised of his *Miranda* rights, appellant

indicated he had consumed two drinks at The Broadway. He submitted to the Breathalyzer and the test revealed a 0.10 percent blood alcohol content (BAC). During a trial before a jury in the Superior Court, Franco testified on direct examination that he had consumed one gin and tonic at approximately 9 p.m. at a friend's house; a mai tai and a tequila sunrise at The Broadway between 10 p.m. and 12 midnight, and two mai tais at Lion O'Reilly's between midnight and 2 a.m. On cross–examination, he indicated he had consumed two kamikazes at Lion O'Reilly's. The appellant testified "I wouldn't call it a buzz, but I felt alcohol, but it wasn't a strong effect". Franco was convicted by the jury of driving while under the influence of intoxicants. On appeal, Franco raised various issues involving the constitutionality of the laws in question and challenged the court's manner of instructing the jury.

I

The first issue raised is whether the law sets out two distinct crimes, or simply alternative methods of committing the same crime. RCW 46.61.502 states:

Driving while under influence of intoxicating liquor or drug—What constitutes. A person is guilty of driving while under the influence of intoxicating liquor or any drug if he drives a vehicle within this state while:
(1) He has 0.10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his breath, blood, or other bodily substance made under RCW 46.61.506 as now or hereafter amended; *or*
(2) He is under the influence of or affected by intoxicating liquor or any drug; *or*
(3) He is under the combined influence of or affected by intoxicating liquor and any drug.
The fact that any person charged with a violation of this section is or has been entitled to use such drug under the laws of this state shall not constitute a defense against any charge of violating this section.

(Italics ours.)

The genesis of this law apparently began when the United States Department of Transportation, in February

1979, produced an issue paper entitled "Alcohol Countermeasures Illegal Per Se and Preliminary Breath Testing". The issue paper encouraged state legislatures to enact "illegal per se laws" establishing, as a traffic offense, the operation of a motor vehicle with a BAC equal to or in excess of a specified level, typically 0.10 percent. These statutes had been enacted in several states. Apparently as a result of the issue paper, the Washington legislature considered testimony from Dr. Ted Loomis, Ph.D., M.D., Professor of Pharmacology and Toxicology at the University of Washington. In a letter to Senator Dan Marsh, Dr. Loomis indicated, among other things, that there is an abundance of scientific support to indicate that with a BAC level of 0.10 percent, all persons are significantly affected. At that level, all persons will have lost one–quarter of their normal driving ability, some persons will have lost as much as one–half of their normal driving ability and a few people will not be able to even sit up in the driver's seat. Dr. Loomis concluded:

> the amount of alcoholic beverages necessary to produce a blood alcohol level of 0.1% is considerable and is believed by most people to represent abusive and excessive acute consumption of alcohol. . . . most people who drink alcoholic beverages will recognize that the consumption of more than 8 to 9 "drinks" (that is, a half pint of whiskey, or one and one–half six packs of beer, or a quart of natural wine) in two or three hours will produce subjective effects and impaired physical performance. Yet, it is the consumption of approximately this amount of beverage that is required to produce a blood alcohol of 0.1% in the average adult.

It was against this backdrop of information the legislature amended the DWI law.

Other jurisdictions have various ways of legislating their prohibitions. Some states make driving with a BAC of 0.10 percent a separate and distinct crime.[1] Other states make

---

[1] *See* Fla. Stat. Ann. § 316.193 (West); Utah Code Ann. § 41–6–44.2.

driving with that BAC a lesser included offense of driving while under the influence of intoxicants,[2] and a third group of states make it an alternate method of committing the crime of driving while under the influence.[3]

■■ The tests for determining whether a statute describes a single offense committable in more than one way or describes multiple offenses is set out in scholarly detail in *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976). They are, briefly: (1) the title of the act, (2) a readily perceivable connection between the various acts set forth, (3) whether the acts are consistent with and not repugnant to each other and (4) whether the acts may inhere in the same transaction. All the tests for a single offense are clearly met in the present statute. In addition, the Washington legislature has not stated that one could be convicted with a BAC of 0.10 percent and concurrently, or additionally, be convicted of driving while under the influence of intoxicants; that is, driving affected in any appreciable degree, and thus, be subject to two penalties. *See State v. Golladay*, 78 Wn.2d 121, 470 P.2d 191 (1970) and *State v. Ladely*, 82 Wn.2d 172, 509 P.2d 658 (1973), for an analysis of the larceny statute which placed great weight on the fact that the subsections describing the manner of committing the crime were joined in the disjunctive by "or". Such is the language in the statute before us. We see no reason to construe the present statute in a manner inconsistent with our views on prior statutes or with the clear, concise, unambiguous language of the statute itself. We, therefore, conclude that under the statute there are three alternate ways of committing the crime entitled DWI.

---

[2]*See* N.C. Gen. Stat. § 20–138.

[3]*See* N.Y. Veh. & Traf. Law § 1192 (McKinney); Or. Rev. Stat. § 487.540; and S.D. Compiled Laws Ann. § 32–23–1, which are identical to the Washington provision. *See also* Del. Code tit. 21, § 4177; Neb. Rev. Stat. § 39–669.07; Vt. Stat. Ann. tit. 23, § 1201, which are similar to the Washington provision.

## II

Appellant contends that the trial court erred in delivering jury instructions Nos. 3 and 4. Jury instruction No. 3 is taken from RCW 46.61.502(1) and reads as follows:

A person commits the crime of driving while under the influence of intoxicating liquor when he drives a motor vehicle while:

(1) He has 0.10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his breath, blood or other bodily substance; or

(2) He is under the influence of or affected by intoxicating liquor.

Jury instruction No. 4 reads:

To convict the defendant GEORGE E. FRANCO of driving while under the influence of intoxicating liquor, each of the following elements must be proved beyond a reasonable doubt:

(1) That on or about the 12th day of September, 1979, defendant drove a motor vehicle;

(2) That at the time the defendant either:

(a) Had 0.10 percent or more by weight of alcohol in his blood, as shown by chemical analysis of his breath, blood or other bodily substance; or

(b) Was under the influence of or affected by intoxicating liquor; and

(3) That the acts occurred in King County, Washington.

If you find from the evidence that elements (1) and (3) and either (2)(a) or (2)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. Elements (2)(a) and (2)(b) are alternatives and only one need be proved.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any of these elements, then it will be your duty to return a verdict of not guilty.

According to appellant, the jury was improperly instructed as the instructions contained impermissible presumptions or, in the alternative, the instructions set out two separate methods for committing the same crime and, as such, the jury should have returned a separate verdict as to each method.

Under the prior DWI statute, RCW 46.61.506, the amount of alcohol in a person's blood created certain presumptions as to whether or not a person was under the influence of intoxicants.[4] Under the present statutory scheme, however, the presumptions have been abolished. Instead, the statute sets out alternate methods of committing the crime of driving while under the influence. The statute does not presume, it defines. Thus, driving with a 0.10 percent BAC is one method of committing the crime of driving while under the influence. Instruction No. 3 is, therefore, proper.

Instruction No. 4 correctly sets out the elements as alternatives which do not require unanimous verdicts as to methods. *State v. Arndt, supra. Arndt* holds that where a single offense is committable in more than one way, it is unnecessary to a guilty verdict that there be more than unanimity concerning guilt as to the single crime charged, provided there is substantial evidence to support each of the means charged. Only if the statute describes several separate and distinct offenses must there be a unanimous verdict as to each separate crime described. *Arndt,* at 377–78.

Here there was sufficient evidence at trial to support both methods charged—the quantum required is set out in *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*"

(Citation omitted.) Of course, this court need not decide that it agrees with the verdict, for the credibility of the witnesses is a matter for the jury.

The appellant cites to *Green* for its proposition that separate jury verdicts are required. *Green* is inapposite here, it

---

[4]RCW 46.61.506 set out that if a person had a 0.05 percent or less BAC he or she was presumed not to be under the influence; if the BAC was between 0.05 and 0.10 percent, it was merely evidence of intoxication; and if the BAC was 0.10 percent or greater, the person was presumed to be under the influence.

dealt with an aggravated murder, the instruction directed the jury to find the defendant guilty if convinced beyond a reasonable doubt that

> defendant caused the death of Kelly Ann Emminger in the course of or in furtherance of rape in the first degree or kidnapping in the first degree.

(Italics omitted.) *Green,* at 231. *Green* determined that there was insufficient evidence to find that there was a kidnapping and thus that issue should not have been submitted to the jury. In deciding on the effect of this, the court noted that, due to the absence of a unanimous jury determination that there was a rape or kidnapping or both, it was possible that some members of the jury based their votes on the invalid kidnapping grounds. *Green* did *not* hold that in all cases of aggravated murder there must be separate jury verdicts regarding each method. That issue was not before the court.

*Green* cited, and carefully distinguished *Arndt* which is clearly controlling in this case.

### III

Appellant next contends that in defining the crime of driving while under the influence as having a 0.10 percent BAC, RCW 46.61.502(1) is itself violative of due process for the accused cannot necessarily know when he has consumed a sufficient amount of alcohol so as to render himself in violation of the law.

■ At the outset, it is important to note that both parties agree that the creation of such legislation is clearly within the police power of the State. The problem arises over whether the statute is constitutionally infirm as, according to appellant, a person can be convicted without fair notice of conduct forbidden by the statute, since the only way to know the weight of alcohol in one's blood is through chemical tests. This argument has been rejected by other jurisdictions which have similar DWI legislation on the basis that it is reasonable to assume that the physical and mental condition of a driver with such a high level of

blood alcohol is impaired. *See, e.g., Roberts v. State,* 329 So. 2d 296 (Fla. 1976); *Greaves v. State,* 528 P.2d 805 (Utah 1974). In addition charts are available through various sources, including the state liquor board, showing the number of drinks necessary to produce the reading. Thus, although one can legally drink and drive, *State v. Hansen,* 15 Wn. App. 95, 546 P.2d 1242 (1976), our DWI law makes it perfectly clear that the two activities cannot be mixed to the extent that the drinking affects the driving, or the driver has a 0.10 percent of alcohol in his blood. No further specificity is required if the statute gives fair warning of prohibited conduct. *See In re Powell,* 92 Wn.2d 882, 602 P.2d 711 (1979).

## IV

The contention that RCW 46.20.308, the "Implied Consent Law", is violative of the Fifth Amendment privilege against self–incrimination is based on the previously discussed statute where, allegedly, a breath sample taken from the DWI suspect has now been rendered testimonial in nature. As such, the accused must have the right to knowingly, intelligently and voluntarily refuse to take the Breathalyzer test without fear of having his license automatically revoked for 6 months.

Under subsection (1) of RCW 46.20.308, all those suspected of driving while under the influence of intoxicating liquor have impliedly consented to the taking of blood or breath samples to determine alcohol content of their blood. The implied consent law creates a statutory right to withdraw this consent and refuse the test, but such refusal results in a 6–month license revocation.

RCW 46.20.308 has withstood the challenge that it violated the Fifth Amendment privilege against compelled self–incrimination. *See State v. Moore,* 79 Wn.2d 51, 483 P.2d 630 (1971). In *Moore,* this court ruled that the implied consent law was not violative of either the Fifth Amendment or article 1, section 9 of the Washington State Constitution. We disposed of the federal constitutional

challenge on the basis of *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966), wherein the United States Supreme Court held that the federally guaranteed privilege against self–incrimination extended only to testimonial or communicative evidence. The court ruled that the Fifth Amendment is not violated when a suspect is compelled to permit withdrawal of his blood so as to analyze the alcohol content, even though the blood alcohol content is evidence which may be used against the suspect because "Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone". *Schmerber,* at 765. In *Moore,* the state constitutional challenge was rejected, the court holding that the definition and interpretation should be the same as that which had been afforded the federal provision.

Notwithstanding *Moore,* Franco renews a challenge to the constitutionality of the implied consent law on the grounds that (a) the Breathalyzer report has been rendered testimonial in nature through the passage of RCW 46.61-.502; and (b) under our state constitution, it is violative of self–incrimination as our provision is less narrowly defined than its federal counterpart.

## A
### EFFECT OF THE NEW DWI LAW ON THE
### IMPLIED CONSENT LAW

When *Moore* was decided, the results of the Breathalyzer test merely gave rise to a presumption of intoxication. *See* former RCW 46.61.506. The Breathalyzer was evidence to be considered with other competent evidence to determine whether a defendant was under the influence of intoxicants. The blood alcohol content merely created a rebuttable presumption which the trier of fact considered in the context of other evidence.

Under the present RCW 46.61.502, however, the presence of a BAC of 0.10 percent, as shown by the Breathalyzer

reading, is not a presumption, conclusive or otherwise, it is an alternate means of committing the crime of driving while under the influence.

Franco contends that this change in status renders the Breathalyzer testimonial in nature in that proof of the Breathalyzer reading constitutes the crime of driving while under the influence, as samples from one's breath may constitute an admission. In support, appellant relies on two recent decisions from the Washington Court of Appeals. *See State v. Moreno,* 21 Wn. App. 430, 585 P.2d 481 (1978); *State v. Dennis,* 16 Wn. App. 417, 558 P.2d 297 (1976). Both *Moreno* and *Dennis* involved prosecutions for the possession of a controlled substance. In each, the defendant, while his movements were restrained by an officer who had probable cause to believe he possessed drugs, produced the cocaine in response to a request and not a valid search warrant. No prior *Miranda* warnings were given. On appeal, each case was reversed and remanded for a new trial.

A review of these cases convinces us that they do not purport to change any existing case law. While we might not adopt the court's language that the production of the cocaine was "testimonial in nature", *Dennis,* at page 422, because the acts of producing the drug supplied the incriminating ingredient of guilty knowledge necessary to prove a case; we note that the *Moreno* and *Dennis* courts were careful to distinguish the *Schmerber* line of cases where the defendant was simply a "'source of "real or physical evidence". *Dennis,* at 422. *See Moreno,* at 433. It has been consistently held that compulsion which makes an accused the source of real or physical evidence does not violate the privilege. It is only violated when the accused is compelled to make a testimonial communication that is incriminating. As stated in *Fisher v. United States,* 425 U.S. 391, 408, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1976), we have accordingly declined to extend the protection of the privilege to the giving of blood samples (*Schmerber*); to the giving of handwriting exemplars (*Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967)); voice

exemplars (*United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967)); or the donning of a blouse worn by the perpetrator (*Holt v. United States,* 218 U.S. 245, 54 L. Ed. 1021, 31 S. Ct. 2 (1910)). *See also State v. West,* 70 Wn.2d 751, 424 P.2d 1014 (1967); *State v. Craig,* 67 Wn.2d 77, 406 P.2d 599 (1965).

██ █ Franco contends that because of the change of the law where 0.10 percent is a method of committing the crime of driving while under the influence, he is no longer the source of real or physical evidence, but is in fact forced to testify by giving his breath sample. He indicates there is now no application or consideration of extraneous facts or circumstances, such as comparison or identification, in order to prove guilt. His analysis is not persuasive. The breath sample must be analyzed, the machine must be proved to be in proper working order beyond a reasonable doubt by the State, the officer who gives the test must be certified and must be proved to be competent at trial. The ampules must be proved beyond a reasonable doubt at trial to have been properly tested and the State always has the burden of proving beyond a reasonable doubt to the jury that the 0.10 percent reading was a correct one. The defense has the same opportunity to attack that reading as they always have had under the prior presumptions. The defense is entitled to an expert witness instruction which was offered in this case by Franco and refused by the court, in error.[5] Additional expert testimony, while available to the defendant, is not the only method of impeaching the reading on the Breathalyzer. The State's expert testimony

---

[5]Defendant's proposed instruction No. 8 reads:

"A witness who has special training, education or experience in a particular science, profession or calling, may be allowed to express an opinion in addition to giving testimony as to facts. You are not bound, however, by such an opinion. In determining the credibility and weight to be given such opinion evidence, you may consider, among other things, the education, training, experience, knowledge and ability of that witness, the reasons given for the opinion, the sources of the witness' information, together with the factors already given you for evaluating the testimony of any other witness." (No exception was taken and this issue was not raised on appeal.)

may be controverted by the defendant testifying about the number of drinks he consumed and the effects of the alcohol upon him, he may call lay witnesses to testify as to those same factors, he may argue that the machine must be in error because of the slight effect the alcohol had upon him. It is simply not the case that the giving of the breath sample proves the crime.

## B
### INDEPENDENT STATE GROUNDS

Defendant also challenges the constitutionality of the implied consent law on the basis that it is violative of article 1, section 9 of the Washington State Constitution.

Article 1, section 9 reads: "No person shall be compelled in any criminal case to give evidence against himself . . ." Defendant contends that this court should interpret our constitutional provision as being more protective than the fifth amendment to the United States Constitution, because our provision protects a person from giving "evidence" against one's own self whereas the federal provision merely prohibits compelling "testimony".

Certainly, this court is free to give a provision of our constitution an interpretation more protective of individual rights than the interpretation given a similar provision of the federal constitution and we have recently done so. *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980); *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980); *Northend Cinema, Inc. v. Seattle,* 90 Wn.2d 709, 714, 585 P.2d 1153, 1 A.L.R.4th 1284 (1978). However, in *State v. Moore,* 79 Wn.2d 51, 483 P.2d 630 (1971), this argument was presented and we chose not to interpret our constitutional provision differently. We decline to overrule *Moore,* which is stare decisis on this issue.

In view of our holding that the DWI statute sets out alternate methods of committing one crime, and that none of the appellant's constitutional rights have been violated, we affirm the trial court.

ROSELLINI, STAFFORD, DOLLIVER, HICKS, WILLIAMS, and DORE, JJ., concur.

830

UTTER, J. (dissenting)—I dissent. While the majority may apply this court's holding in *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976) correctly, I feel the foundation upon which *Arndt* stands is unsuitable. A different analytical structure is needed for determining whether a court should require a jury to unanimously agree upon the elements that compose at least one of the alternative means by which a criminal offense can be committed. Applying this analysis to the case before us, I would require a jury to agree unanimously on at least one of the alternative theories by which a violation of RCW 46.61.502 might occur.

I

The analytical structure set forth in *Arndt* provides a 4-part approach for determining whether, in the absence of express legislative intent, a criminal statute sets forth a single crime which can be committed by alternative means or a series of separate crimes. That approach is:

> [I]n determining the question, there may be many factors that will aid the court, such as [1] the title of the act; [2] whether there is a readily perceivable connection between the various acts set forth; [3] whether the acts are consistent with and not repugnant to each other; [4] and whether the acts may inhere in the same transaction.

*State v. Arndt, supra* at 379, quoting from *State v. Kosanke,* 23 Wn.2d 211, 213, 160 P.2d 541 (1945). While this test may assist courts in distinguishing single from multiple offenses, it is not always helpful.

More fundamentally, since the *Arndt* test was devised to determine if a statute represents a single or multiple crime, it does not address all the concerns that are presented by the requirements of a unanimous verdict. The *Arndt* test derives from cases in which duplicity of a prosecutorial information was at issue. *See, e.g., State v. Kosanke,* 23 Wn.2d 211, 160 P.2d 541 (1945); *Arndt,* at 388 (Brachtenbach, J., dissenting). These duplicity cases did not address

concerns for unanimity that continue to exist once a court has decided the statute presents a single crime capable of commission by alternative means.

## II

Defendants in the state of Washington have a right to be convicted by a unanimous jury verdict. *State v. Stephens,* 93 Wn.2d 186, 607 P.2d 304 (1980); *State v. Badda,* 63 Wn.2d 176, 385 P.2d 859 (1963). We indicated in *Stephens* that the interest in a unanimous criminal verdict is constitutional in nature. That constitutional interest derives from the defendant's right to a jury trial under article 1, section 22 of the Washington State Constitution. While the constitutional nature of the unanimous verdict requirement has been recently questioned, *see State v. Hall,* 95 Wn.2d 536, 627 P.2d 101 (1981), we need not resolve the issue for present purposes.[6] Whether constitutional or not, we have always required a unanimous jury verdict in criminal trials.

A second concern, closely related to the requirement of a unanimous verdict, is the prosecution's burden of proving the defendant guilty beyond a reasonable doubt. In *In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970), the United States Supreme Court established the due process clause of the Fourteenth Amendment requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime with which an accused is charged. *Id.* at 364; *State v. Hanton,* 94 Wn.2d

---

[6]The court's questioning of the constitutional nature of this interest in *State v. Hall,* 95 Wn.2d 536, 627 P.2d 101 (1981) seems unfounded, especially in the context of a felony charge. There is no reason for us to hesitate to state explicitly that the interest in a unanimous verdict is constitutionally grounded. The United States Supreme Court has long held the unanimity requirement is inherent in the Sixth Amendment right to trial by jury for federal criminal defendants. *See Johnson v. Louisiana,* 406 U.S. 356, 369–71, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972); *Hawaii v. Mankichi,* 190 U.S. 197, 211–12, 47 L. Ed. 1016, 23 S. Ct. 787 (1903). Furthermore, the unanimity requirement helps effectuate the closely related reasonable doubt standard made constitutional in *In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970), indicating its constitutional dimensions. *See Johnson, supra* at 362; *United States v. Gipson,* 553 F.2d 453, 457 n.7 (5th Cir. 1977). See discussion in text, section II.

129, 131–32, 614 P.2d 1280 (1980) (Horowitz, J., dissenting). We in turn have stated, "In our legal system, the burden is always upon the prosecution to establish every element of the crime charged by proof beyond a reasonable doubt." *State v. Roberts,* 88 Wn.2d 337, 340, 562 P.2d 1259 (1977).

Where a unanimous verdict is required, as is the case in our state, the jury must unanimously agree that every element of the crime is established beyond a reasonable doubt for convictions to be valid. Where alternative means exist for the commission of a crime and those means articulate different elements that must be established beyond a reasonable doubt for a verdict of guilty to issue, it is illogical to state a jury can reach a unanimous verdict as to guilt yet fail to reach unanimity as to at least one of the means of commission. It is logically impossible for a jury to agree unanimously on guilt and at the same time fail to reach unanimity on at least one of the set of elements comprising a means to commission of the offense. Such a guilty verdict would be inherently faulty because it would fail to represent a jury's unanimous conclusion that the prosecution had established all the elements of the crime beyond a reasonable doubt, as is constitutionally required by *In re Winship, supra.*

> Like the "reasonable doubt" standard, which was found to be an indispensable element in all criminal trials in *In re Winship,* 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the unanimous jury requirement "impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue". 397 U.S. at 364, 90 S.Ct. at 1072, 25 L.Ed.2d at 375. The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required.

(Footnote omitted.) *United States v. Gipson,* 553 F.2d 453, 457–58 (5th Cir. 1977).

The *Arndt* test fails to accommodate the constitutional requirements of *In re Winship, supra.* The anomaly of our recent decision in *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980) underscores the inadequacy of the *Arndt* test. *Green* was correct in result, yet a departure from the *Arndt* test.

### III

Assuming a court can ascertain a statute provides alternative means to the commission of a single offense, it must then determine if unanimity as to the means of commission is required. To say a statute sets forth a single crime capable of commission by alternative means is not to say that the set of elements composing one theory of a means of commission is the same as a set of elements composing another means. The task before us is to establish criteria for distinguishing alternative means that require jury unanimity from those that do not.

First, the court must ascertain what elements are necessary for the commission of the offense: what factors (both mental and physical) must a jury unanimously find established for a constitutional verdict of guilt.

Concentration on the essential elements of a crime is a broader focus than that provided by the *Arndt* test, which addresses only "acts." That term is not broad enough to cover all the elements the prosecutor must prove beyond a reasonable doubt to establish a crime. Elements of a criminal offense may be both physical and mental; most often, they are both. When the element is a physical act, it is more apparent that unanimity is required. The jury must "be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *United States v. Gipson, supra* at 457–58. It is less obvious that what the defendant "did" includes both his acts and state of mind. For example, in the case of a murder prosecution, there is

often no question about what acts the defendant performed, but resolution of the defendant's state of mind will be dispositive of whether the defendant's acts were justified or the basis for the most severe punishment our criminal justice system provides. Without agreement on the litigable mental elements, the jury cannot arrive at a verdict of guilty of murder. *See State v. Green, supra; State v. Golladay,* 78 Wn.2d 121, 137, 470 P.2d 191 (1970); *People v. Embree,* 68 Mich. App. 40, 241 N.W.2d 753 (1976) (Holbrook, J., dissenting); *People v. Olsson,* 56 Mich. App. 500, 224 N.W.2d 691 (1974); *Jackson v. State,* 92 Wis. 2d 1, 284 N.W.2d 685 (Ct. App. 1979).

In identifying the necessary *Winship* elements, the court must look separately at each means and reduce each to the elements necessary to commission under that theory. In reducing each means to its essential *Winship* elements, the court must be careful not to generalize the elements of the crime to the fact of the crime itself, unless there is truly only one element of the crime and it is equivalent to the crime itself. *See People v. Embree, supra* at 43 (court considered the only element of crime of murder to be the fact of murder itself and concluded means to commission are only technical or "functionally" the same). If the only element of the crime were the crime itself, the means would always be "technical" and the "elements" analysis of *Winship* would be fruitless.

Once all the essential elements of each means have been identified, the court must determine whether the set of elements for each alternative means are the same: essentially, the court must determine if the alternative means are synonymous. This requires the court to look at the kind of prosecutorial evidence needed to establish the necessary elements of one means as opposed to those of another. If the evidence directed to proof of each means' necessary elements is always the same, the alternative means are synonymous. If not, the means involve distinguishable elements. When the means are distinguishable in this way, the jury must unanimously agree on at least one set of elements

that comprise a means of committing the offense.

IV

The statutory context within which this case arises fully tests this analysis.

I agree with the majority that the new statute sets out alternative means by which the offense of DWI can occur. One can say that all the means "measure the effect of alcohol and/or drugs on the individual,"[7] Brief of Respondent, at page 23, but the statute sets out a single offense for which an offender can be punished once. All the means have at least two elements in common: (1) driving, and (2) in the state of Washington. All the means are not identical as to *all* their elements, however. Under section 1 of the statute the prosecutor must in addition prove beyond a reasonable doubt that the defendant's blood alcohol was at least 0.10 percent. Under sections 2 and 3 of the statute, the prosecution must in addition prove the defendant was "affected in some appreciable degree" by the use of alcohol or drugs or their combination. *State v. Hurd,* 5 Wn.2d 308, 105 P.2d 59 (1940); *State v. Hansen,* 15 Wn. App. 95, 546 P.2d 1242 (1976).

Section 2 of the statute refers to the use of alcohol or drugs; section 3 refers to their combined use. In determining what additional elements of sections 2 and 3 are essential to commission of DWI, I would state that additional element as: (3) the defendant was affected in some appreciable way by some drug. Alcohol, after all, is a drug. Sections 2 and 3 state only that the trier of fact may find a

---

[7]The statute at issue underscores the importance of avoiding reduction of the elements of the crime to the crime itself. See discussion in text at section III. One could say, for instance, that the only element of this crime is driving in the state of Washington while under the influence of intoxicating liquor or drugs, the crime itself. This generalization would be easy considering the parallel language of the offense, "under the influence", and of sections 2 and 3 of the statute, "under the influence of or affected". But the language of the offense is a legal conclusion and that of the means is a finding of fact derived from evidence that the defendant was appreciably affected by some drug. Even where the language is the same, it is important to distinguish the crime from its elements.

person guilty of DWI if while driving within the state that person was affected appreciably by some drug. The prosecution need not independently establish it was alcohol, another drug, or their combination that caused that effect.[8]

Having identified the essential elements of each of the alternative means by which a DWI conviction may be obtained, it is apparent the elements and proof for section 1 are different from those for sections 2 and 3. For example, in this case the prosecutor presented evidence of the Breathalyzer test and its validity to obtain conviction under section 1. Nothing else need be shown to establish section 1's distinguishing element and a resulting DWI conviction. Under sections 2 and 3, however, the prosecutor presented different evidence to demonstrate some appreciable effect of alcohol or drugs or their combination. Evidence was presented concerning the defendant's driving ability, his difficulty in negotiating a left–hand turn, the smell of alcohol on his breath, and the speed at which he was driving.

Since the essential elements of section 1 are different from those of sections 2 and 3, the trial court should have required the jury to unanimously agree on at least one of the two alternative theories of committing the offense of DWI.

In conclusion, RCW 46.61.502 sets forth only one crime. Nonetheless, the difference in essential elements contained within each theory dictates a requirement of jury unanimity on at least one of those theories for a valid conviction.

Remand to the trial court should be uniformly required where the trial court has failed to instruct the jury that it must reach unanimity on at least one set of elements necessary to commission of the crime, unless such constitutional error can be termed harmless beyond a reasonable

---

[8]It would be unreasonable to impute to the legislature a desire that a jury unanimously decide whether a particular drug or a combination of drugs affected appreciably the defendant's driving ability. A jury might sincerely differ on whether it was alcohol, another drug or their combination, but such differences are only technical and all satisfy the additional *Winship* element of sections 2 and 3, "the defendant was affected in some appreciable way by some drug."

doubt. *Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *State v. Stephens,* 93 Wn.2d 186, 191, 607 P.2d 304 (1980); *State v. Badda,* 63 Wn.2d 176, 385 P.2d 859 (1963). Accordingly, the trial court's failure to so instruct in this case was reversible error.

V

While the approach proposed here gives the jury rigorous responsibilities, those responsibilities are no greater than what the constitution mandates. Fears that requirements of jury unanimity on at least one theory by which an offense may be committed will result in undue burdens on the criminal process and acquittals based on technicalities are unfounded.

The unanimity requirement would not increase the prosecution's burden. The prosecution will be forced only to establish each necessary element of a criminal offense to a unanimous jury. But this is a burden to which it is accustomed; *Winship* established this requirement some time ago.

The court, of course, will need to interpret the statute: first, to determine if it articulates a single or multiple offense; second, to identify the offense's essential *Winship* elements; and third, to decide whether alternative means to commission of the offense contain the same or different elements. The court has always been required to follow the first two steps, and the third, while additional, is both important to the court's understanding of the statute and essential to ensuring *Winship*'s constitutional mandate is not undermined.

The jury will be forced to "sift through the proofs and reconcile their various perceptions of what facts the prosecution has proved." Note, *Constitutional Law—Criminal Procedure—Jury Instructions and the Unanimous Jury Verdict,* 1978 Wis. L. Rev. 339, 349. While prosecutorial proofs may be similar and overlapping, this will not lead to the risk of acquittal based on jury indecision on a "techni-

cal" matter. The approach proposed here does not require a jury to reach unanimity on *only* one means of commission; it requires jury unanimity on *at least* one means of commission. Where means are similar and one prosecutorial set of proof may establish both, juries are free to unanimously agree that the offense has been committed by more than one of the prosecutor's theories.[9]

If the jury fails to reach unanimity on the necessary elements of an offense, our system requires acquittal. The test requires no more of jurors and the constitution requires no less.

BRACHTENBACH, C.J., concurs with UTTER, J.

Reconsideration denied March 2, 1982.

---

[9]For example, the prosecution might bring alternative theories of murder by premeditation and felony–murder in the commission of a robbery, which are theories with different *Winship* mental elements. The robbery may very well be part of the premeditated design to kill, so the evidence the prosecution will present to prove premeditation will include the intent to rob; such evidence may very well establish guilt via both theories. Nonetheless, unanimity with respect to at least one of the theories by which the crime may be committed remains the minimum constitutional requirement for conviction.